In re NORTHWESTERN CORPORATION, Debtor–Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Defendant.

Bankruptcy No. 03–12872(JLP).

Adversary No. 04–53072(JLP).

United States Bankruptcy Court, D. Delaware.

Feb. 11, 2005.

Charles Michael Terribile, Dennis A. Meloro, Greenburg Traurig LLP, Evelyn

J. Meltzer, Pepper Hamilton LLP, Monica Leigh Loftin, Greenberg Traurig, LLP, Paul D. Brown, Wilmington, DE, Robert Lee Striker, Leonard Street and Deinard, Minneapolis, MN, Scott D. Cousins, Victoria Watson Counihan, Greenberg Traurig, LLP, William Pierce Bowden, Ashby & Geddes, William E. Chipman Jr., Jr., Greenberg Traurig, LLP, Wilmington, DE, for Debtor in Possession.

Charlene D. Davis, The Bayard Firm, Donna L. Harris, Cross & Simon, LLC, Eric Michael Sutty, GianClaudio Finizio, The Bayard Firm, John C. Phillips, Jr., Phillips, Goldman & Spence, Wilmington, DE, for Creditor Committee.

## ORDER GRANTING MOTION OF PLAINTIFF TO COMPEL ARBITRATION

JOHN L. PETERSON, Bankruptcy Judge.

In this insurance coverage adversary proceeding, North Western Corporation (the "Plaintiff"), as a successor to the Montana Power Company through a series of purchase transactions, seeks by motion to compel National Union Fire Insurance Company of Pittsburgh, Pa. (the "Defendant") to arbitrate a dispute pursuant to the terms of policy number BE 932–96–74 (the "Policy"), issued by Defendant for a period from September 1, 1999 to September 1, 2000, and then extended by Endorsements 22, 23 and 24, for a period to expire December 31, 2001. The Policy provides for insurance protection for claims involving "bodily injury" caused by an "occurrence—neither expected nor intended from the standpoint of the insured." The Policy provides for a $50 million coverage limit, with a $2 million per occurrence self-insured deductible. The Policy also provides for reimbursement or payment of the costs of defense of any action against the insured.

During the Policy period, on May 19, 2000, Montana Power and PP & L Montana were sued by five plaintiffs for damages related to personal injuries suffered by employees Noel, Vaught and Anderson on April 24, 2000, at a facility known as Colstrip Unit 1 generation plant, which was then owned and operated by PP & L after purchase from Montana Power in 1999. The litigation was ultimately settled, with the Plaintiff paying $8.5 million in damages, and accruing $144,085 in legal costs and fees in defense of the *Noel, et al.* litigation.

After notice of the above claim to Defendant, on June 20, 2002, the Defendant notified Plaintiff by letter that it reserved the right to deny coverage related to the settlement on various grounds, including: that the injuries did not fall within the definition of "occurrence;" that the Defendant did not consent to the transfer of the policy to Plaintiff from Montana Power, as required under the terms of the Policy; and that arbitration is not warranted because the arbitration clause language does not cover the events arising from the underlying claim.

The parties have filed copious memorandum and exhibits dealing with the arbitration issue. The Court entertained oral argument on the matter on February 10, 2005. From the briefs and arguments the Court now determines that the matter is ripe for arbitration.

The Policy provides, as set forth on page 4 of the Defendant's memorandum, the following pertinent provisions:

(i) Section VI [Conditions] of the Policy provide under paragraph "O" as follows:

Your rights and duties under this policy may not be transferred without our written consent.

(ii) Endorsement 6 [Arbitration Endorsement] provides:

Should an irreconcilable difference of opinion arise as to the interpretation of this policy, it is hereby mutually agreed that, as a condition precedent to any right of action hereunder, such difference shall be submitted to arbitration. If either of the parties fails to appoint an arbitrator within one (1) month after being required by the other party in writing to do so, or if the arbitrators fail to appoint an umpire within one (1) month of a request in writing by either of them to do so, such arbitrator or umpire, as the case may be, shall at the request of either party be appointed by a justice of the court having jurisdiction. [Emphasis added].

(iii) Section VI [Conditions] of the Policy also contains a Condition [Endorsement 12] which provides:

Before an insured makes a settlement payment, payment of a judgment, or other payment that requires indemnity payment by us under this policy, the insured shall obtain our consent, which consent shall not be unreasonably withheld.

(iv) The Conditions of the Policy [Endorsement 12] also provides:

No insured will, except at their own cost, voluntarily make payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

At the outset, the Court requested the parties to submit memorandum dealing with this Court's jurisdiction over the matter in controversy. The Plaintiff filed for Chapter 11 relief, and on October 20, 2004, the Court confirmed the Debtor's Second Amended Plan of Reorganization (Docket No. 2237). Article VIII, subsection 8.3, p. 62, of the Second Amended Plan (Docket No. 2020), entitled "Insurance Policies," notes the pending action and provides:

The parties intend that only a final binding order in settlement agreement entered in the National Union Adversary Proceeding shall control the parties' representative rights and obligations arising from or under the National Union Policy. As such, nothing contained in the Plan or Confirmation Order, including the Debtor's assumption of executory contracts under Section 8.1 through 8.3 of this plan, shall affect coverage under the National Union Policy or National Union's rights, defenses, limitations and/or exclusions to be raised in the National Union Adversary Proceeding.

Since the parties have a wide difference of opinion with respect to the arbitration issue, the Court must first resolve whether it has jurisdiction to order or deny arbitration, and second whether the arbitration clause is enforceable under Montana law.

■ I hold that it is clear from the pleadings and memorandum that this dispute involves state contract rights and obligations. The Plaintiff has amended its complaint to include the jurisdictional argument that this controversy is a non-core proceeding. The Defendant has conceded such allegation in its memorandum; and the Court, in allowing the amendment, included in the order that the Defendant is deemed to have admitted the non-core allegation. Further, the present dispute is a non-core matter because the proceedings implicate "a right created by state law, a right independent of and antecedent to the reorganization ...." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 84, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Thus framed, the issue is whether this Court has discretion to deny a motion to compel arbitration of a non-

core dispute. If the Court determines it has such jurisdiction, then it must necessarily proceed to the validity of the arbitration clause.

A number of federal circuit court decisions have reached the conclusion that bankruptcy courts must compel arbitration regarding non-core proceedings, assuming, of course, all other requirements of a binding arbitration agreement are present. The Third Circuit so held in *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir.1989). The *Hays* Court distinguished between core and non-core proceedings, and concluded that the chapter 11 trustee, who objected to arbitration, was bound by a pre-petition arbitration contract. *Id.* at 1153–54.

> We see no reason to make an exception for arbitration agreements to the general rule binding trustees to pre-petition non-executory contracts, especially in face of the strong federal policy favoring arbitration, *see Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985), and the Arbitration Act, which puts arbitration agreements on the same footing as other contracts. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974).

*Id.* Thereafter (and before), other courts of appeals have concurred that arbitration agreements in non-core bankruptcy proceedings are subject to arbitration, notwithstanding the filing of a Chapter 11 petition. *In re Gandy*, 299 F.3d 489 (5th Cir.2002); *Matter of National Gypsum Co.*, 118 F.3d 1056, 1065 (5th Cir.1997); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir.2000) ("the presumption in favor of arbitration generally will trump the lesser interest of bankruptcy courts in adjudicating non-core proceedings .... The unmistakable implication is that bankruptcy courts generally *do not* have discretion to *decline* to stay *non-core* proceedings in favor of arbitration, and they certainly have authority to grant such a stay." (emphasis in original)); *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999).

Therefore I conclude that absent other legally compelling reasons, such as are advanced in this proceeding, the parties do not dispute the making of the agreement, and this Bankruptcy Court would not be able to deny a motion to compel arbitration in this non-core case.

■ The pertinent issue to decide is focused on language found in *Shearson/American Exp., Inc. v. McMahon, supra:* "Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command." 482 U.S. at 226, 107 S.Ct. 2332. Here, we have a rather unique situation. It is the insurer who refuses to arbitrate and honor the arbitration clause it inserted into the insurance agreement. Its reasoning is based on the pure legal theory that the Montana Arbitration Statute, Mont. Code Ann. § 27–5–114(2)(c), prevents arbitration of an insurance contract. Section 27–5–114 reads:

> (2) A written agreement to submit to arbitration any controversy arising between the parties after the agreement is made is valid and enforceable except upon grounds that exist at law or in equity for the revocation of a contract. Except as permitted under subsection (3), this subsection does not apply to:
>
> (a) claims arising out of personal injury, whether based on contract or tort;
>
> (b) any contract by an individual for the acquisition of real or personal property, services, or money or credit when

the total consideration to be paid or furnished by the individual is $5,000 or less;

(c) any agreement concerning or relating to insurance policies or annuity contracts except for those contracts between insurance companies; [1]

That brings us to *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). There the Court held that the special notice required under the Montana statute was "displaced" by the Federal Arbitration Act's ("FAA") declaration that written contract provisions for arbitration are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* at 687, 116 S.Ct. 1652 (citing 9 U.S.C. § 2). Plaintiff here argues that the *Doctor's Assoc.* holding also invalidates subsection (2)(c). Specifically, in *Doctor's Assoc.*, the Court stated:

Repeating our observation in *Perry* [*Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520], the text of § 2 declares that state law may be applied "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." 482 U.S. at 492, n. 9[, 107 S.Ct. 2520]. Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2. (Citing cases).

Courts may not, however, invalidate arbitration agreements under state laws applicable only to arbitration provisions. (Citing cases). By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed "upon the same footing as other contracts." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Montana's § 27–5–114(4) directly conflicts with § 2 of the FAA because the State's law conditions the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally. The FAA thus displaces the Montana statute with respect to arbitration agreements covered by the Act.

*Id.* at 686–87, 116 S.Ct. 1652.

Clearly, then, based on consistent Supreme Court decisions, "state legislation requiring greater information or choice in the making of agreements to arbitrate then in other contracts is preempted" by the FAA. *Id.* (citing *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), and *Perry, supra*). To summarize, what States may not do is decide that a contract is fair enough to enforce all of its basic terms (*e.g.*, price, service, credit), but not fair enough to enforce its arbitration clause. Thus, the FAA makes any such state policy unlawful. 513 U.S. at 281, 115 S.Ct. 834.

Based on the above rationale, Plaintiff argues that section 27–5–411(2)(c) is unenforceable, and therefore arbitration must be compelled under the FAA.

Not so, argues Defendant National Union. Defendant asserts that the FAA is reverse preempted by the McCarran–Ferguson Act. *See* 15 U.S.C. § 1012(b). "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of

---

**1.** In *Young v. Security Union Title Ins. Co.*, 292 Mont. 310, 971 P.2d 1233 (1998), the Montana Supreme Court held the term "insurance policies" pertains to title insurance policies as well as other types of insurance coverage. The *Young* case is not determinative of any issue here.

regulating the business of insurance, ..., unless such Act specifically relates to the business of insurance ...." 15 U.S.C. § 1012(b). Basically, Defendant contends that section 27–5–411(2)(c) is a statute that regulates the business of insurance, relying on *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), and several lower court decisions.

In *Fabe*, which gave effect to Ohio's statute governing priority of payment to creditors in a state insolvency proceeding, the Court noted: "All that is left for us to determine, therefore, is whether the Ohio priority statute is a law enacted 'for the purpose of regulating the business of insurance.'" *Id.* at 500, 113 S.Ct. 2202. In *S.E.C. v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Court emphasized that the focus of McCarran–Ferguson is to open the relationship between the insurance company and its policy holders. *Id.* at 460, 89 S.Ct. 564. "The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'" *Id.* The Court further noted that where a State law protects State insurance policyholders, it is a law enacted regulating the issuance of insurance, but when it protects other interests, for instance those of the insurance companies, it is not such a law within the meaning of McCarran–Ferguson. *Id.*

However, the connection to the protection of the policy-holders cannot be too attenuated. *See Fabe*, 508 U.S. at 508–09, 113 S.Ct. 2202. For example, in *Humana Inc. v. Forsyth*, 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (analyzes effect of McCarran–Ferguson on RICO suit with respect to the particular suit rather than the general operation of the statute), and *Int'l Ins. Co. v. Duryee*, 96 F.3d 837,

838–40 (6th Cir.1996) (finding a an Ohio statute that prevented removal to federal court was not enacted for the purpose of regulating insurance, but instead was for the parochial purpose of regulating a foreign insurer's choice of forum), the courts concluded the statutes at issue were not covered by McCarran–Ferguson's sweep. Yet, the case law runs both ways. In *Munich American Reinsurance Co. v. Crawford*, 141 F.3d 585 (5th Cir.1998), Oklahoma's Uniform Insurance Regulation Act was held to be within McCarran–Ferguson's sweep, such that the state law reverse-preempted the FAA, and thus the insolvent insurance company could not be compelled to enter arbitration. *Id.* at 590–91. The *Munich* Court rightly noted that "the precise degree to which a state statute may be impaired so as to trigger the McCarran–Ferguson Act is not well-settled," but found impairment in that case. *Id.* at 595. Then came *Davister Corp. v. United Republic Life Ins. Co.*, 152 F.3d 1277 (10th Cir.1998), *cert. denied* 525 U.S. 1177, 119 S.Ct. 1112, 143 L.Ed.2d 108, which similarly held that the FAA was reverse-preempted by a Utah statute "consolidating all claims against a liquidating insurer." *Id.* at 1281; *see also Stephens v. American Intern. Ins. Co.*, 66 F.3d 41, 43–45 (2d Cir.1995) (trumping the FAA under McCarran–Ferguson and the Kentucky Insurers Rehabilitation and Liquidation Law).

Confirming *Munich's* admonition, a different line of cases refuses to find reverse-preemption. Criticizing *Munich*, the Fourth Circuit in *Gross v. Weingarten*, 217 F.3d 208 (4th Cir.2000), held "concurrent federal jurisdiction over the defendants' counterclaims [does not] threaten[ ] to 'invalidate, impair, or supersede' (as those terms are used in the McCarran–Ferguson Act) Virginia's efforts to establish a single equitable proceeding to liquidate or rehabilitate insolvent insurers." *Id.* at 222.

And in *Suter v. Munich Reinsurance Co.*, 223 F.3d 150 (3d Cir.2000), the court, employing "enacted for the purpose" language of McCarran–Ferguson, found no impairment in a suit by a liquidator against a reinsurer to enforce contract rights for an insolvent company, which, if successful, would benefit the estate. *Id.* at 160–62. In *Grode v. Mutual Fire, Marine and Inland Ins. Co.*, 8 F.3d 953 (3d Cir. 1993), the Third Circuit rejected the McCarran–Ferguson argument made by the Insurance Commissioner on grounds that "[t]he action instituted by the Commissioner in this case has nothing to do with Pennsylvania's regulation of insurance." *Id.* at 960. In *Nichols v. Vesta Fire Ins. Corp.*, 56 F.Supp.2d 778 (E.D.Ky. 1999), the court concluded under Kentucky laws that the pending action was a common law breach of contract action which merely happens to involve an insolvent insurer and was not subject to the exclusive jurisdiction of the liquidation court. *Id.* at 780.

*AmSouth Bank v. Dale*, 386 F.3d 763 (6th Cir.2004), presents a situation where two banks brought a declaratory judgment action against insolvent insurance companies seeking a judgment that the banks were not liable to the receivers in connection with a money laundering scheme. The *AmSouth* Court held that analysis of McCarran–Ferguson preemption of the Declaratory Judgment Act, which is much like the remedy provided by the FAA, must focus on whether impairment is defined with respect to the particular cause of action. *See Id.* at 783.

> That is, an ordinary suit against a tortfeasor by an insolvent insurance company implicates a "regulation of the business of insurance" only in the attenuated fashion rejected in *Fabe;* an antisuit injunction would only be a regulation of the business of insurance to the extent it protected the assets of the insurance

> company from suit.... Ultimately, we conclude that it would be an overly expansive reading of the case law and the purposes of the doctrine to find McCarran–Ferguson reverse preemption here. The threatened declaratory judgment actions against insolvent insurance companies for the purpose of evading liability in a threatened common-law coercive action by the insurance companies have only an attenuated connection to regulating the business of insurance.

*Id.* at 783. Thus, McCarran–Ferguson did not reverse preempt the Federal Declaratory Judgment Act. *Id.*

Here, we have a motion to compel arbitration under the FAA on a breach of contract state law claim dealing with a myriad of issues posed by an insurance company who is denying coverage. It is clearly private litigation that can have no meaningful impairment on Montana's ability to regulate the business of insurance. Indeed, it is somewhat strange that the Defendant would place an arbitration agreement in its policy, and then claim a policyholder cannot arbitrate under that clause's language because it directly affects Montana's regulation of the business of insurance. I do not read the case authorities under McCarran–Ferguson as extending that far. As the Third Circuit stated in *Grode, supra,* this private action seeking a resolution of coverage by arbitration "has nothing to do with" Montana's regulation of insurance. *See* 8 F.3d at 960.

I believe this holding is consistent with the three-part test articulated in *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), discussed in *Fabe, supra,* "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer

and the insured; and third, whether the practice is limited to entities within the insurance industry." *Id.* at 129, 102 S.Ct. 3002. This standard clearly reflects, as *Fabe* held, that a State's interest in protecting insurance policyholders through legislation of an insurance company must be preserved. *Fabe* held exactly that when it determined McCarran–Ferguson applied to the Ohio priority scheme because the scheme was designed to protect policyholders so they would receive payment on their claims. That was the "practice" that *Fabe* sustained.

Finally, to conclude that this action does not involve the McCarran–Ferguson Act, one only has to look at Montana's extensive statutory code provisions under Title 33, MCA, entitled "Insurance and Insurance Companies." The chapters under Title 33 cover matters dealing with:

Chapter 1. "Administrative and General Provisions."

Chapter 2. "Regulation of Insurance companies" through

Chapter 37. "Regulation of Health Carriers and Managed Care Entities."

Nowhere in Title 33 is there a provision dealing with forum selection for settling private disputes between an insured and insurer, or interpretation and application of a contract of insurance. What is covered are those "practices" involving required certificate of authority to do business in the State, sec. 33–2–128, MCA, prohibition of acts by unauthorized insurers, sec. 33–2–105, MCA, requirements for capital and surplus funds, sec. 33–2–109, MCA, renewal, expiration, suspension and revocations of certificates of authority, sec. 33–2–117, MCA, assets and liability reserves, Part 5, and authority of the State insurance commissioner to promulgate rules and regulations, sec. 33–2–128, MCA, to name a few. It is noteworthy that policy arbitration provisions are not includ-

ed in such regulatory scheme. Finally, the Montana insurance code is the exclusive method by which Montana regulates the "practices" and regulation of insurance. Sec. 33–1–123, MCA, Sec. 33–1–123 specifically provides:

Provisions of this Code relative to a particular kind of insurance or a particular type of insurer or, to a particular matter shall prevail over provisions relating to insurance in general or insurers in general or to such matter in general.

In other words, the Montana insurance code is the exclusive method of regulation and therefore prevails over any other provision of Montana law or other insurance law. Thus, the McCarran–Ferguson Act does not trump the FAA. The FAA therefore trumps section 27–5–114, so that the arbitration provision of the insurance policy is binding on this plaintiff and defendant.

Here there is no statutory framework invoking the Office of the Montana Insurance Commissioner to protect a class of policyholders. The present dispute is a one-on-one legal battle over coverage, where a single policyholder seeks a forum under the FAA to resolve a coverage dispute. Montana has no interest in this litigation; indeed, its prohibition against arbitration of insurance claims is directed solely against an insured being forced into arbitration when it does not want to do so. The FAA, however, represents a different standard, and thus federal policy preempts section 27–5–114(2)(c) of the Montana Arbitration Statute in this case.

■ At the outset of this memorandum, I set forth a pertinent Policy dispute raised by the Defendant. Sufficed to say, that each of those Policy provisions are matters properly submitted to arbitration, as is the amount, if any, due under the Policy. In other words, it is the duty of

the arbitrators to determine whether this dispute involves an "interpretation of the policy," not this Court.

■ Finally, there is a unique circumstance which is before the Court dealing with the prior appointment of two arbitrators by a Montana State District Court, where the matter was first presented. The Defendant seeks to have those appointments set aside and the Plaintiff resists.

9 U.S.C. § 5 provides: "If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; . . . ." As noted above, Endorsement 6 [Arbitration Endorsement] provides a method to appoint arbitrators. It is clear from the record that the Defendant's right or duty to appoint an arbitrator of its choice was not accorded to the Defendant.

More importantly, since that state court appointment process occurred, the Plaintiff sought Chapter 11 relief, and by the terms of the Confirmation Order set forth above, all rights of defense and claims by the Defendant were reinstated in this adversary proceeding. In other words, confirmation of the plan vacated the prior state court order. Therefore, I conclude that the prior state court orders appointing arbitrators are void. This conclusion is buttressed by the fact that under 9 U.S.C. § 4, it is specifically provided that the arbitration hearing "shall be within the district in which the order directing such arbitration is filed." Thus, venue for the arbitration lies in Delaware.

It is therefore ORDERED:

1. The Motion of Plaintiff to Compel Arbitration under the Federal Arbitration Act is granted;

2. The parties shall, within fifteen days of this order, submit to the Court their respective nominations of an arbitrator;

3. Each arbitrator selected by the respective party shall receive compensation at the expense of each party, and the umpire shall receive compensation at the rate of $450 per hour; and

4. All arbitration proceedings shall be conducted in the District of Delaware.